UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CRYSTAL LAKE COMMUNITY
ASSOCIATION, INC., in its
representative capacity on behalf of
itself, and all current and former
mobile homeowners in the Park,

     Plaintiffs,                   Case No. 8:21-cv-00151

Vs.

PATRICK ZILIS, HOMETOWN
AMERICA COMMUNITIES, INC.,
HOMETOWN AMERICA
MANAGEMENT, L.L.C.,
HOMETOWN COMMUNITIES
LIMITED PARTNERSHIP,
HOMETOWN COMMUNITIES, LLC,
REALTY SYSTEMS, INC., MHC
OPERATING LIMITED PARTNERSHIP,
EQUITY LIFESTYLE PROPERTIES,
INC., MHC CRYSTAL LAKE, L.L.C.,
ERIC ZIMMERMAN, STANLEY
MARTIN, SCOTT MAUPIN,
SYDNEY MORRIS, LINDA
TOLENTINO, KATE RUSSO,
FLORIDA MANUFACTURED HOUSING
ASSOCIATION, INC., J. ALLEN BOBO,
and LUTZ, BOBO & TELFAIR, P.A.,
d/b/a Lutz, Bobo, Telfair,
Eastman & Bobo, f/k/a
Lutz, Webb & Bobo, P.A.,

     Defendants.
_____/

**AMENDED COMPLAINT AND DEMAND
FOR JURY TRIAL
(ADA CLAIM OMITTED)**

# TABLE OF CONTENTS

Page

I.     **INTRODUCTION**     4

    A.     Representative Action by the Crystal Lake HOA     6

    B.     The Nature of the Product or Service: "55 or Older" Mobile Home Park     7

    C.     Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry     7

    D.     Geographic Area or the Market: Pasco County, Florida     8

II.     **DEFENDANTS**     9

    A.     The Hometown Park Sale Defendants     10

    B.     The MHC/ELS Park Purchase Defendants     10

    C.     The FMHA Trade Association Defendant     14

    D.     The Lutz Bobo Law Firm Defendants     14

III.     **JURISDICTION AND VENUE**     15

IV.     **ACTS IN FURTHERANCE OF THE CONSPIRACY**     16

    A.     Purchase of the Park Under an "Unsolicited Offer"     16

    B.     Extort Adoption of an Illegal Rental Agreement     19

    C.     Purchasers Deceived Into Adoption of a Market-based Prospectus     28

    D.     Concealed Park-wide Flooding From Home Purchasers     29

    E.     Fraudulent and Unreasonable Lot Rental Categories & Amount     31

    F.     Unreasonable Elimination or Reduction of Services     32

V.     **COUNT 1: FLORIDA ANTITRUST ACT**     35

VI.     **JURY TRIAL DEMANDED**     42

The Crystal Lake Community Association, Inc., in its representative capacity on behalf of itself, and more than 450 current and former mobile homeowners in the Crystal Lake Mobile Home Park ("Park"), by and through the undersigned counsel, bring this Complaint against these Defendants, divided into four defined relationships:

- The **Hometown Park Sale Defendants**: Patrick Zilis, an individual, Hometown America Communities, Inc., a Delaware corporation, Hometown America Management, L.L.C., a Delaware limited liability company, Hometown Communities Limited Partnership, a Maryland limited partnership, and Hometown Communities, LLC, a Maryland limited liability company;

- The **MHC/ELS Park Purchase Defendants**: Realty Systems, Inc., a Delaware corporation, MHC Operating Limited Partnership, an Illinois limited partnership, Equity LifeStyle Properties, Inc., a foreign (Maryland) corporation, MHC Crystal Lake, L.L.C., a foreign (Delaware) limited liability company, Eric Zimmerman, an individual, Stanley Martin, an individual, Scott Maupin, an individual, Sydney Morris, an individual, Linda Tolentino, an individual, and Kate Russo, an individual;

- The **FMHA Trade Association Defendant**: Florida Manufactured Housing Association, Inc., a Florida corporation;

- The **Lutz Bobo Law Firm Defendants**: J. Allen Bobo, an individual, and Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Bobo, f/k/a Lutz, Webb & Bobo, P.A., a Florida corporation.

The individuals and entity defendants defined above are collectively referred to in this Complaint as "Defendants." The Plaintiff further alleges:

## I. INTRODUCTION

1. Beginning at a time uncertain, but as least as early as 2010, and continuing on through the present time, the Defendants have entered into and engaged in a conspiracy, combination, or concert of consciously parallel business conduct: a) in unreasonable restraint of trade and commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of §542.18 of the Florida Antitrust Act of 1980; and b) to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce within the State of Florida and elsewhere with effects in the State of Florida in violation of §542.19 of the Florida Antitrust Act of 1980; by agreeing to the following:

A. Avoid and frustrate the Plaintiff's statutory right of first refusal to purchase the Park on behalf of itself and the mobile homeowners represented by the Plaintiff;

B. Extort the Plaintiff into adoption of an illegal lot rental agreement;

C. Deceive and defraud resale purchasers into adoption of a market-based prospectus;

D. Concealed Park-wide flooding from resale purchasers;

E. Imposed fraudulent and unreasonable lot rental categories and amount; and

F. Unreasonably eliminated or reduced services.

Engaging in the business of owning and operating mobile home parks within the State of Florida constitutes trade or commerce within the meaning of Chapter 542, *Fla. Stat.*

2. As a result of the unlawful conduct, the elderly mobile home owners represented by the Crystal Lake Community Association, Inc., suffered an antitrust injury resulting in damages in excess of $30,000.00. This conspiracy, combination, or concert of action resulted in higher mobile home lot rental prices paid by elderly natural persons for the use of mobile home park facilities than would have existed in a competitive

market.

3.      Defendants' unlawful conduct is continuing and unless equitable relief is granted artificially inflated mobile home lot rental prices for the use of mobile home park facilities will continue unabated.

### A.    Representative Action by the Crystal Lake HOA

4.      Plaintiff Crystal Lake Community Association, Inc., ("**Crystal Lake HOA**"), is a Florida not-for-profit corporation with its principal place of business located at 4620 Lake Crystal Blvd., Pasco County, City of Zephyrhills, Florida. The Crystal Lake HOA is an incorporated mobile home owner association and the legal representative under § 723.075 (1), *Fla. Stat.*, of all of the mobile home owners in the Park "in all matters relating to the Florida Mobile Home Act." *See* §§ 723.075(1) and 723.076(1) and in "matters of common interest." *Rule* 1.222, *Fla. R. Civil P.* The Plaintiff represents itself, and more than 450 current and former mobile homeowners in the Park. The relationship between the Crystal Lake HOA, the homeowners represented by the Crystal Lake HOA and the Park owner or operators is regulated under Chapter 723, *Fla. Stat.*, and encompasses a broadly defined "lot rental agreement" which includes, *inter alia*, three prospectuses. Composite Exh. A is attached and adopted.

### B. The Nature of the Product or Service: "55 or Older" Mobile Home Park

5.      The Park is an age 55 or older mobile home park with 519 mobile home rental residential lots (with 366 homes). The Park is located at 4604 Lake Crystal Blvd., Pasco County, City of Zephyrhills, Florida. The mobile homeowners represented by the Crystal Lake HOA are largely elderly persons more than 65 years of age. The mobile homes are valued between $25,000 and more than $100,000. Most homes are paid for with cash, usually comprising all or a substantial amount of the homeowners' life savings. They lease the lot underneath their mobile home from the Park owner or operators.

### C. Sam Zell, Chairman of Equity Lifestyle, Likes the "Oligopoly" Nature of the Mobile Home Park Industry

6.      Approximately 1.8 million Floridians today live in a mobile home. In a 2014 Tampa Bay Times newspaper article, it was noted that the population of Florida mobile homeowners represents five times the entire population of the city of Tampa, Florida. Most of those homeowners earn less than $30,000 per year. Largely, those mobile homeowners are a captive audience: "... As Frank Rolfe, a park owner who runs [the[ Mobile Home University, a boot camp for investors, told *Bloomberg*, 'We're like a Waffle House where everyone is chained to the booths." *Mobile home park*

*investors bet on older, poorer America*, Tampa Bay Times, May 19, 2014.[1]

"Years ago, the mobile home industry was mostly ignored save for a few investment titans. Warren Buffet paid $1.7 billion in 2003 to buy Clayton Homes, one of America's largest mobile home conglomerates. Sam Zell, the billionaire chairman of Equity Lifestyle, said in a 2012 conference call he liked the 'oligopoly nature of our business.'" [referring to the mobile home park industry] *Id*. The MHC/ELS Park Purchase Defendants directly or indirectly own, control, or operate 77 age-qualified Florida mobile home parks with approximately 32,000 mobile home sites with gross revenues in excess of $230 million annually.

**D.      Geographic Area or the Market: Pasco County, Florida**

7.      Pasco County has a population of approximately 500,000 persons. Twenty seven per cent of the population is 65 years of age or older. There are 93 mobile home parks in Pasco County, Florida. Forty five of those parks are "55 or older" mobile home parks which would market to a group of elderly retirees, such as those represented by the Crystal Lake HOA. The monthly lot rental amount varies by only a minor amount between the Park and the "comparables" used by the Defendants in rejecting the representative Crystal Lake HOA's attempts to negotiate

1        https://www.tampabay.com/news/business/realestate/mobile-home-park-investors-bet-on-older-poorer-america/2180277/

mitigation of the existing regular annual lot rental increases of four to five per cent.

## II.   DEFENDANTS

### A.   The Hometown Park Sale Defendants

8.    Defendant **Patrick Zilis** is an individual citizen of Illinois domiciled at an unknown physical location in Illinois. Patrick Zilis was Chief Investment Officer of Forest Estates FSPE, LLC, (a prior owner of the Park withdrawn from Florida in October 2013) and is currently a Director of Hometown America Communities, Inc., with its principal place of business at 150 N. Wacker Dr., Chicago, Illinois.

9.    Defendant **Hometown America Communities, Inc. ("HAM Inc.")**, is a foreign (Delaware) corporation with its principal place of business in Illinois at 150 N. Wacker Dr., Chicago, Illinois.

10.    Defendant **Hometown America Management, L.L.C. ("HAM LLC")**, is a foreign (Delaware) limited liability company with its principal place of business in Illinois at 150 N. Wacker Dr., Chicago, Illinois.

11.    Defendant **Hometown Communities Limited Partnership ("HAM LP")**, is a foreign (Maryland) limited partnership with its principal place of business in Illinois at 150 N. Wacker Dr.,

Chicago, Illinois.

12.     Defendant **Hometown Communities, LLC ("HC LLC")**, is a foreign (Maryland) limited liability company with its principal place of business in Illinois at 150 N. Wacker Dr., Chicago, Illinois.

13.     Defendants Patrick Zilis, HAM Inc., HAM LLC, HAM LP, and HC LLC are collectively referred to herein as the "Hometown Park Sale Defendants."

**B.     The MHC/ELS Park Purchase Defendants**

14.     Defendant **Realty Systems, Inc., ("Realty Systems")** is a foreign (Delaware) corporation with its principal place of business in Illinois at Two North Riverside Plaza, Suite 800, Chicago, Illinois.

15.     Defendant **MHC Operating Limited Partnership ("MHC Operating")**, is a foreign (Illinois) limited partnership, formed in 1993 with a principal address of Two North Riverside Plaza, Suite 800, Chicago, Illinois, which is also the Chicago corporate headquarters for Defendants Equity LifeStyle Properties, Inc. and MHC Crystal Lake, L.L.C. MHC Operating is also engaged in business at the Park. MHC Operating is a general partner of Equity LifeStyle Properties, Inc., since April 2004. MHC Operating is described in official court records in the Pasco County Clerk of Court as the "mobile home park owner" of the Park as defined by

§ 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." MHC Operating is also an operator of the Park.

16. Defendant **Equity LifeStyle Properties, Inc., ("ELS Inc.")** is a foreign (Maryland) corporation with its principal place of business in Florida at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County; and in Illinois at Two North Riverside Plaza, Suite 800, Chicago, Illinois. ELS Inc., is the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." ELS Inc., is also an operator of the Park. ELS Inc., is publicly traded on the New York Stock Exchange.

17. Defendant **MHC Crystal Lake, L.L.C. ("MHC LLC")** is a Delaware limited liability company with its principal place of business in Florida located at 4604 Lake Crystal Blvd., Zephyrhills, in Pasco County; and in Illinois at Two North Riverside Plaza, Suite 800, Chicago, which is also the Chicago corporate headquarters for Defendants ELS Inc. MHC LLC is also engaged in business at the Park. MHC LLC is described in official court records in the Pasco County Clerk of Court as the "mobile home park owner" of the Park as defined by § 723.003(13), *Fla. Stat.*, which includes an "owner" or "operator." MHC LLC is also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.* Its Managing Member is

MHC Operating, the same holding company for Defendant ELS Inc.

18.    Defendant **Eric Zimmerman** is an individual citizen of Florida domiciled at 12629 New Brittany Blvd., #16, Fort Myers, in Lee County, Florida. Eric Zimmerman was a Southeast Division President of Hometown America from January 2003 through December 2011. He was a Regional Vice President of Defendant ELS Inc., from January 2011 through July 2018. He is currently Vice President and Chief Operating Officer at Murex Properties, LLC. Eric Zimmerman was also engaged in business from 2011 through July 2018 as an operator of the Park as defined by § 723.003(16), *Fla. Stat.* He has held leadership positions of the Defendant FMHA Trade Association Defendant – the trade association for park owners.

19.    Defendant **Stanley Martin** is an individual citizen of Florida domiciled in Hillsborough County, Florida at an unknown physical location. Stanley Martin is employed at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County, Florida. Stanley Martin is a Vice President and Corporate Counsel of Defendant ELS Inc., from 2015 through present day. He is a licensed Florida lawyer since 1999. Stanley Martin is described in official court records in the Palm Beach County Clerk of Court as a lawyer for Defendants MHC LLC, and ELS Inc.

20.     Defendant **Scott Maupin** is an individual citizen of Florida domiciled at 8401 International Dr., Orlando, in Orange County, Florida. Scott Maupin was a Vice President of Defendant ELS Inc., from October 2017 through 2019. Scott Maupin was also engaged in business at the Park. Scott Maupin was also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.* Scott Maupin is now Divisional Director of Merlin Entertainments in Orlando, Florida.

21.     Defendant **Sydney Morris** is an individual citizen of Florida domiciled in Plant City, Hillsborough County, Florida at an unknown physical location. Sydney Morris is employed at 4300 W. Cypress St., Suite 400, Tampa, in Hillsborough County, Florida. Sydney Morris is a Senior Regional Manager of Defendant ELS Inc., and has been employed as such since 2015. Sydney Morris is also engaged in business at the Park. Sydney Morris is also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.*

22.     Defendant **Linda Tolentino** is an individual citizen of Florida domiciled at 6250 Timberly Lane, Zephyrhills, in Pasco County, Florida. Linda Tolentino is a Community Manager and an employee of Defendants ELS Inc., and MHC LLC. Linda Tolentino is also engaged in business at the Park. Linda Tolentino is also an "operator" of the Park as

defined by § 723.003(16), *Fla. Stat.*

23.     Defendant **Kate Russo** is an individual citizen of Florida domiciled at 34708 Marta Ave., Zephyrhills, Pasco County, Florida. Kate Russo was a General Manager from 2015 - 2018 and an employee of Defendant ELS Inc., and MHC LLC. Kate Russo was also engaged in business at the Park. Kate Russo was also an "operator" of the Park as defined by § 723.003(16), *Fla. Stat.*

24.     Defendants ELS Inc., MHC LLC, Eric Zimmerman, Stanley Martin, Scott Maupin, Sydney Morris, Linda Tolentino, and Kate Russo are collectively referred to herein as the "MHC/ELS Park Purchase Defendants."

**C.     The FMHA Trade Association Defendant**

25.     Defendant **Florida Manufactured Housing Association, Inc., ("FMHA Trade Association Defendant")** is a Florida corporation with its principal place of business at 1284 Timberlane Rd., Tallahassee, Florida. FMHA Trade Association Defendant, is the trade association for the Florida mobile home park owners.

**D.     The Lutz Bobo Law Firm Defendants**

26.     Defendant **J. Allen Bobo ("Allen Bobo")** is an individual citizen of Florida domiciled in Sarasota County, Florida at an unknown

physical address. Allen Bobo is a licensed Florida lawyer since 1982, a partner, principal, or shareholder of Defendant Lutz, Bobo & Telfair, P.A., 2 N. Tamiami Trail, Ste. 500, Sarasota County, Sarasota, Florida.

27.     Defendant **Lutz, Bobo & Telfair, P.A. ("LBT PA")**, d/b/a Lutz, Bobo, Telfair, Eastman, Gabel & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida.

28.     Defendants Allen Bobo and the LBT PA are collectively referred to herein as the "Lutz Bobo Law Firm" Defendants.

## III.   JURISDICTION AND VENUE

29.     Count One of this Complaint is an action for treble damages for violation of §§ 542.18 and 542.19 of the Florida Antitrust Act of 1980, Chapter 542, *Fla. Stat.*, in accord with § 542.22, *Fla. Stat.*, and for injunctive or other equitable relief in accord with § 542.23, *Fla. Stat.* This Court has jurisdiction of this claim under § 542.30, *Fla. Stat.* This Court also has personal jurisdiction over each Defendant under § 48.193, *Fla. Stat.*, because, among other reasons, each Defendant operates, conducts, engages in, or carries on a business or business venture in the State of

Florida or has an office in the State of Florida or has committed a tortious

act or acts within the State of Florida.

30.     Venue is proper under §§ 47.011, 47.021, and § 542.30, *Fla.*

*Stat.*

31.     Plaintiff seeks damages in excess of $30,000.00, injunctive

or other equitable relief, attorneys' fees, and costs on behalf of the

represented mobile homeowners.

## IV.     ACTS IN FURTHERANCE OF THE CONSPIRACY

### A.     Purchase of the Park Under an "Unsolicited Offer"

32.     In June 7, 2011 correspondence to the Crystal Lake HOA,

the Hometown Park Sale Defendants, the MHC/ELS Park Purchase

Defendants, and the Lutz Bobo Law Firm Defendants misrepresented to

the Crystal Lake HOA and the elderly Plaintiff-homeowners that the sale

of the Park owned by Forest Estates FSPE, LLC, and Hometown America,

L.L.C., to purchaser MHC LLC, was arranged through an "unsolicited

offer":

****

... **Owner has received an unsolicited offer to sell the Community to a prospective purchaser** (the "Buyer"). This letter and the Exhibits hereto shall serve as notification to the Association of the price, material terms and conditions upon which Owner is selling the Community to Buyer. The price, material terms and conditions of the offer are stated in

Exhibit B attached hereto and the Agreement (defined below) - a partially redacted copy of which is attached hereto as Exhibit C. Owner has agreed to sell the Community to Buyer pursuant to the Purchase and Sale Agreement dated May 31, 2011 and the Purchase and Sale Agreement dated May 31, 2011 [Home and Home Loans] between affiliates of Owner and Buyer and its affiliates (jointly, the "Agreement"). **The Agreement was based entirely upon an unsolicited offer from Buyer to Owner.** Capitalized terms used herein, but not otherwise defined in this Notice, shall have the meaning given to such term in the Agreement... **Owner has provided this Notice subject to the express reservations of Section 723 .071(2), Florida Statutes, which provides that Owner is under no obligation to sell the Community to the Association nor interrupt or delay its negotiations with Buyer**...."

****

(Exh. B is attached and adopted) (Emphasis added)[2]

33.     The Hometown Park Sale Defendants, the MHC/ELS Park Purchase Defendants, and the Lutz Bobo Law Firm Defendants further misrepresented that the sale of the Park was arranged through an "unsolicited offer" in a July 7, 2011 recorded affidavit executed by Patrick Zilis, Chief Investment Officer of Forest Estates FSPE, LLC, and Director of Hometown America Management Corp.:

---

2     While Exhibit B is a facsimile of a "form" notice letter (itself referring to an exhibit specifying the Orlando-based Hidden Valley Mobile Homeowners' Association, Inc.), the Plaintiff cannot locate its copy of the form notice letter and package directed in 2011 to their incorporated Association. The Plaintiff's Board of Directors recalls they received such a package, including the form notice letter authored by the Lutz Bobo Law Firm Defendants.

****

Simultaneously with the execution of this Affidavit, Hometown is conveying title to the Property to MHC CRYSTAL LAKE, L.L.C., a Delaware limited liability company ("Purchaser") pursuant to that certain Purchase and Sale Agreement dated May 31, 2011 among Hometown and certain affiliates of Hometown, as seller, and affiliates of Purchaser, as purchaser (as amended and assigned to Purchaser, the "Agreement").

**Affiant states that Hometown received an unsolicited offer to purchase the Property from Purchaser's affiliate which resulted in the Agreement**. The Property was not offered for sale to the general public.

****

(Exh. C is attached and adopted) (Emphasis added)

34.     The offer to purchase the Park was not "unsolicited." The purchase was a "bundled" purchase of a massive portfolio of hundreds of mobile home parks arranged through brokers, agents, or attorneys for the Park Sale Defendants. The Hometown Park Sale Defendants, the MHC/ELS Park Purchase Defendants, and the Lutz Bobo Law Firm Defendants concealed that the offer was solicited; the consequence of which frustrated the Crystal Lake HOA's statutory right of first refusal to match the contract terms and conditions under § 723.071(1), *Fla. Stat.* (Exh. D is attached and adopted).

35.     The Hometown Park Sale Defendants, the MHC/ELS Park Purchase Defendants, and the Lutz Bobo Law Firm Defendants concealed

the true circumstances and nature of the solicited sale and purchase of the Park from the Plaintiff mobile home owners and the Crystal Lake HOA through June 2018 when the Crystal Lake HOA learned of the misrepresentation.

**B.      Extort Adoption of an Illegal Rental Agreement**

36.      In 2016, the MHC/ELS Park Purchase Defendants, outside of either statutory meetings or confidential mediation efforts, extorted the representative Crystal Lake HOA and Plaintiff mobile homeowners to adopt an illegal standardized lot rental agreement ("LTA") authored and drafted by the Lutz Bobo Law Firm Defendants. The FMHA Trade Association Defendant, encouraged distribution and discussion of the terms of the LTA among its assembly of mobile home park owners. A copy of the form or standardized LTA is attached as Exh. E and adopted.

37.      The standardized LTA extorts and injures the homeowners represented by the Plaintiff by requiring them to forfeit their statutory and constitutional protections and remedies in direct contravention of the Florida Mobile Home Act including, but not limited to: Section 4 of the standardized LTA required that if the Crystal Lake HOA contended that MHC LLC was in violation of the LTA, the prospectus, any rental agreement, or the Florida Mobile Home Act, the Crystal Lake HOA must

notify MHC LLC in writing of the facts "giving rise to and constituting such alleged Non-Compliance" by certified mail within sixty days of the date the Crystal Lake HOA received reasonable notice of such facts. The LTA then provided MHC LLC fifteen days from receipt of the notice to "cure" the alleged non-compliance. Upon completion of any such cure, MHC LLC was to be "deemed" not to have been in default or in violation.

38.     Section 4 of the LTA further required that the sixty day notice and fifteen day opportunity to cure provisions be deemed to be a condition precedent to any legal action.

39.     Section 5 of the LTA prohibited an award of attorneys' fees or costs in any proceeding "by or on behalf of any former or current Homeowner seeking to invalidate or otherwise dispute the validity of the [LTA]." Further, section 3 of the LTA required, in direct contravention of the Florida Mobile Home Act's statutory declaration of a fiduciary relationship between the Crystal Lake HOA and the Plaintiff homeowners, the Crystal Lake HOA and MHC LLC to "mutually enforce this Agreement and cooperate fully in the event the validity or integrity of this Agreement is attacked or disputed by any such Homeowner."

40.     Section 6 of the LTA required that any controversy or claim related to the LTA shall first require non-binding mediation under Chapter

44, *Fla. Stat.*

41.    Section 6 of the LTA also required, in direct contravention

of the Florida Mobile Home Act, the Florida Constitution, and the U.S.

Constitution, that in any court proceeding "arising out of or relating to" the

LTA, the parties must waive their right to a jury trial.

42.    Section 8 "Mutual Release" of the LTA expressly releases

the Defendants (along with a broad litany of unknown and unidentified

persons and entities) and:

> ... their parents, affiliates, subsidiaries, officers, directors,
> agents, stockholders, members, attorneys, successors and
> assigns from any and all claims, actions or causes of action
> of any kind whatsoever ("Claims"), whether legal, equitable,
> administrative, or otherwise, which the Association now has
> or ever had including, but not limited to, Claims involving
> or relating to rents, services, maintenance, or Owner's
> compliance with or delivery of the Community's prospectuses,
> rental agreements, as well as any other alleged violation of
> Chapter 723, Florida Statutes. With the exception of Claims
> involving the subject matter of this Agreement, this release
> shall address only Claims existing on the Effective Date. This
> release shall not apply to any Homeowner's failure to pay rent
> or a rules violation.

43.    Section 9 of the LTA elevated the LTA as controlling in

the event of a conflict between the LTA and the prospectus or rental

agreement.

44.    Section 10 of the LTA declared that the LTA superseded

all prior and contemporaneous discussions, negotiations, conditions or understandings relating to the LTA.

45. The MHC/ELS Park Purchase Defendants' close relationships with the FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants enable them to collaborate with other mobile home park owners and ultimately with each other to develop and expand state-wide adoption of the LTA by other mobile home park owners. In 2016 Attorney Allen Bobo, partner in the Lutz Bobo Law Firm, described that he worked closely with Eric Zimmerman, then Senior Vice President of ELS Inc., on revisions and implementation of LTAs identical to the LTA in the instant cause. In one instance, recited Allen Bobo, a homeowner (in another ELS Inc., Park) pointed to an ambiguity in the LTA favorable to their homeowner association. In response, Eric Zimmerman then quipped to Allen Bobo: "How did you miss that one, Allen?"

46. In the March 28, 2013 meeting notes of the ELS Inc., supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida ELS Inc., Parks and Eric Zimmerman discussed the LTA:

****

ELS standardized the Long Term Agreement 3-4 years ago but has made some minor tweaks to it as needed. The only thing that will change from community to community will be the amount of the increase and the term. There will be no wish lists included in future LTAs, strictly rent. Wish lists (to be included in the Capx budget), are to be discussed with the manager and regional manager at the quarterly meetings (which must be requested).

****

(Exh. F is attached and adopted)

47.    In the September 12, 2013 meeting notes of the Select Committee of the ELS Inc., supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida ELS Inc., Parks and Eric Zimmerman discussed the LTA:

****

Long Term Agreements: were discussed, first with the ELS definition being a rental agreement that may change the terms of the prospectus. This was not an in depth discussion of rental agreements but was brought up because several communities are reporting that ELS has refused to meet and discuss long term agreements. We were reminded by Eric [Zimmerman] that they are actually required to meet just once and that should be within the thirty days (as requested) after receiving the 90 day notice per FS, Chapter 723.037. Eric [Zimmerman] pointed out that the negotiating committee has the full authority to sign the long term agreement.

****

(See Exh. F)

48.     In the November 21, 2013 meeting notes of the Select

Committee of the ELS Inc., supported Networking for Progress Group, the

notes taken of the meeting between representatives of various Florida ELS

Inc., Parks and Eric Zimmerman discussed the LTA:

****

Future LTAs will be reviewed by in house counsel. It was pointed out that the language in the LTA, particularly that referring to the waiver, is one of the reasons that communities are not signing the agreement. Eric [Zimmerman] pointed out that that paragraph refers only to situations that have occurred to that point (NOT FUTURE SITUATIONS). If there are issues serious enough that you are considering legal action against ELS they should be discussed (prior to signing the agreement) in an effort to work them out. The purpose of the waiver is after working out a favorable agreement in good faith, they (ELS) don't want to be faced with a lawsuit.

Remember, if you previously signed the long term agreement (LTA) (containing the clauses referenced above), when the LTA expires, so do the terms of those clauses, UNLESS the LTA contained language stating otherwise. Communities with CPI (only) based increases typically don't have long term agreements. Eric [Zimmerman] explained that the release for ELS in the LTA speaks to the many reasons somebody may choose to sue them. The reason the HOA isn't offered the same release is because there don't appear to be any reasons why ELS would want to sue them.

Long Term Agreements may vary, but are typically three years. Rounding of rent increases are determined by the prospectus for the community, some allow rounding up to one (1) dollar, some allow up to five (5) dollars.

**There are no penalties for not signing the long term agreement.**

Market, CPI, home sales and a variety of economic factors are taken into consideration to determine rates of increase, not the expected return to stockholders, as suggested.

****

(See Exh. F) (Emphasis Added)

49.     In the February 19, 2015 meeting notes of the Select Committee of the ELS Inc., supported Networking for Progress Group, the notes taken of the meeting between representatives of various Florida ELS Inc., Parks and Eric Zimmerman discussed the LTA:

****

... Relocating resident policy: ELS's policy regarding relocating residents is the same as addressed in the LTA under Homeowners Affected by this Agreement; Transferees. lf ..... any included Homeowner transfers or sells any legal or equitable interest in such Homeowner's mobile home to any transferee or resale purchaser (collectively, a "Transferee"), the Transferee shall be permitted to assume such included Homeowners rental agreement but only for the remainder of the annual lease term then in effect between the included Homeowner and Owner. Upon the expiration of such annual lease term the Transferee's rent shall be adjusted to the Community's then prevailing market rate ..... " Which is basically the same as FS Chapter 723.059 (3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller ........... .

It should be noted that residents relocating within the community that are purchasers of ELS inventory homes won't

> have a lease to assume and will start their new lease at market
> rent but are eligible for any rent concession programs being
> offered to new residents at that time.
>
> ****

(Exh. G is attached and adopted)

50.     In 2016, Florida Attorney Shawn Arbeiter disclosed that

Attorney Allen Bobo (then a partner and shareholder of the Lutz Bobo Law

Firm) had made numerous and regular annual presentations to the FMHA

Trade Association Defendant's annual meeting of Florida mobile home

park owners informing the FMHA Trade Association Defendant's assembly

of litigation tactics of mobile home plaintiffs' attorneys. According to

Arbeiter, those lengthy presentations by Bobo included opinionated and

disparaging remarks by Bobo and assembly members of the undersigned

Plaintiff's Counsel Perry's trial strategy including, but not limited to:

application of the Florida Deceptive and Unfair Trade Practices Act to lot

rental, common area maintenance, and LTA issues in state court litigation.

Attorney Bobo also disclosed that in an earlier and separate presentation

to the FMHA Trade Association Defendant assembly, he described existing

statewide mobile home lot rental amounts as "not high enough," explaining

that if lot rent increases were appropriately higher, that retiree mobile

homeowners would be filing lawsuits all over the state.

51. The MHC/ELS Park Purchase Defendants intentionally and fraudulently continued to bundle $62,837.51 in ad valorem taxes into the base rent used to calculate annual rent increase for the homeowners represented by the Plaintiff beginning in 2008 causing improper, illegal, and oppressive percentage increases in the resulting lot rental amount each and every year since. As of the date of the filing of this Complaint, the total accumulated overcharges in the entire Park (323 total homes) exceeds $207,000.00. On repeated occasions since 2017, the MHC/ELS Park Purchase Defendants have acknowledged that they have improperly bundled the ad valorem into the base rent calculations but refuse to "unbundle" the $62,837.51 in ad valorem tax pass-ons from the base rent since the Crystal Lake HOA refuses to sign a LTA forfeiting the homeowners rights under Florida and federal law. In December 2, 2015 email correspondence with Crystal Lake HOA President/Director Rita Bernard, Eric Zimmerman wrote that ELS Inc., cannot unbundle the tax pass-on amount "... ***unless your group would be willing to sign a long term agreement. In the past, you have been unwilling to sign.***" Exh. H is attached and adopted (Emphasis Added).

52. In 2018, the MHC/ELS Park Purchase Defendants added 153 developed (but unoccupied) lots bringing the total lots to 519. As

a consequence of the additional developed lots the tax valuation of the Park increased significantly. The MHC/ELS Park Purchase Defendants incorrectly divide the increased ad valorem taxes among the 366 homeowners rather than the full 519 lots, thereby improperly and illegally pass-on the substantial share of their increased tax valuation to each of the elderly Plaintiff homeowners at a rate of an additional $6 monthly or $72 annually—forever.

### C.     Purchasers Deceived Into Adoption of a Market-based Prospectus

53.     The MHC/ELS Park Purchase Defendants provided approximately 35 elderly prospective resale homeowners with purportedly legal "assumption of lease" or other documents which had the effect of adoption of the P3 prospectus. The resale purchasers were hurriedly directed - with little or no explanation - to sign the documents. These documents illegally mis-characterize the existing lease associated with a $5 or CPI based prospectus as "expired" and the assumption of the new market based lease associated with the P3 prospectus as a "new" lease. The MHC/ELS Park Purchase Defendants told Plaintiff mobile home owners they had to assume or adopt the P3 prospectus in order to "transfer the lease" and to be approved for purchase with MHC LLC.

54.     Most elderly prospective resale homeowners were
not provided with a copy of the P3 prospectus prior to or even
contemporaneous with the execution of the lot rental agreement. Most
were not provided a copy of the prospectus until weeks or months after
closing. Many homeowners discovered that their fraudulent adoption of
the P3 prospectus caused or will cause a subsequent significantly higher
compounded lot rent and ad valorem tax pass-ons.

55.     When questioned by prospective resale purchasers about
the assumption of the existing lower rent and expense Pl prospectus,
Defendants Sydney Morris, Linda Tolentino, and Kate Russo told the
purchasers that they were "simply" required to present the *original* signed
copy of the earlier prospectus issued to the seller or the purchasers would
not be allowed to assume the earlier prospectus.

**D.     Concealed Park-wide Flooding From Home
        Purchasers**

56.     Since 2015 approximately 60% of the homes in the Park have
significant levels of stormwater in the streets adjacent to their homes.
In some sections of the Park, water will accumulate and remain in the
streets for up to three months at a time. Approximately 20% of the homes
in the Park frequently have water under their homes. In some sections of

the Park, water will accumulate and remain under the homes from a few days to a month at a time. The pond near the intersection of the streets Tangelo and Eagle's Peak have overflowed onto neighboring mobile home lots twice in the weeks preceding the filing of this Complaint. The MHC/ELS Park Purchase Defendants failed to disclose to the prospective elderly mobile home purchasers that significant portions of the Park suffer regular and extensive stormwater floods. Those homeowners represented by the Plaintiff who inquired were and are told by the MHC/ELS Park Purchase Defendants: "There is no flooding issue" in the Park.

57.     The regular and extensive flooding interfere with the elderly Plaintiff homeowners' right of access and enjoyment of their homes, the Park facilities, and common areas. In many instances, the flooding damaged the home and the air conditioning systems. Numerous homeowners complain that their home is settling or sinking inches into the dirt under their homes. One frustrated homeowner even went to the expense and effort to hire his own expert evaluation of his home sinking into the lot. A copy of his expert report is attached as Exh. I and adopted.

### E. Fraudulent and Unreasonable Lot Rental Categories & Amount

58.     The MHC/ELS Park Purchase Defendants' lot rental categorization of the retention pond called the "Six Mile Pond" as "lake front" or "on-water" and warranting a $20 per month premium is fraudulent.

59.     Since 2018 the MHC/ELS Park Purchase Defendants imposed a 5% to 5.3% annual lot rental increase. In the years prior - except for 2018 in which the MHC/ELS Park Purchase Defendants imposed no rent increase in response to the building consensus among the homeowners to file a lawsuit - the MHC/ELS Park Purchase Defendants imposed a flat four per cent annual lot rental increase. The MHC/ELS Park Purchase Defendants refused to discuss with the representative Homeowners' Committee of the Crystal Lake HOA the basis or justification for the flat four and five per cent lot rental increase. The MHC/ELS Park Purchase Defendants flatly rejected the Crystal Lake HOA's Homeowners' Committee's submission of other park comparables and other matters in mitigation of a four and greater than five per cent lot rental increase in violation of Florida law.

**F.     Unreasonable Elimination or Reduction of Services**

60.    The MHC/ELS Park Purchase Defendants unreasonably eliminated or reduced services without an advance 90 day written notice or a corresponding reduction in lot rent in violation of Florida law, including, but not limited to:

a.    The MHC/ELS Park Purchase Defendants are unresponsive and have reduced maintenance;

   1.    Full-time maintenance staff reduced;

   2.    The MHC/ELS Park Purchase Defendants do not respond to the majority of phone calls, emails, and other correspondence;

   3.    The MHC/ELS Park Purchase Defendants arbitrarily enforces rules and regulations and are unavailable after normal business hours to enforce the rules and regulations;

b.    Security

   1.    The Park back area has no gate and no fencing. The MHC/ELS Park Purchase Defendants only just paid in August 26 for a permit to build a gate and fence but they keep stalling: this simply encourages unregistered and unknown pedestrian

and vehicular traffic to come into the Park. The Park, then, is no longer a gated or secure Park;

c.    Clubhouse

    1.    The MHC/ELS Park Purchase Defendants have no security or supervision of members of the general public who use the clubhouse facilities;

    2.    The Clubhouse was shut down in March 2020 as a result of the existing COVID-19 pandemic and reopened in August 2020 without proper sanitization or enforcement of a mask requirement, exposing the homeowners to a virulent infectious disease and an enhanced morbidity due to their largely immuno-suppressed pre-existing medical conditions and advanced age. Neither the closure nor the improper re-opening was accompanied by an advance 90 day written notice to the Plaintiff or a reduction in lot rent corresponding to the reduced service.

d.      Common Areas - Streets

    1.      The streets throughout the Park and clubhouse parking lots are in disrepair, crumbling and dangerous to pedestrians and bicycle traffic;

    2.      Streets throughout the Park are unsightly. Grass grows in some of the cracks in the pavement;

    3.      The MHC/ELS Park Purchase Defendants have eliminated RV storage in the Park;

e.      "55 and Older" Park

    1.      The MHC/ELS Park Purchase Defendants have failed to supervise or restrict children in the shared facilities in the Park as required by the properly promulgated Park rules and regulations. Underage and unlicensed persons frequently drive golf carts without supervision.

## V.   COUNT I:  FLORIDA ANTITRUST ACT
### (Against All Defendants)
### §§ 542.18 and 542.19, *Fla. Stat.*

61.   Plaintiff realleges and restates paragraphs 1 through 60 as if fully set forth herein and further state:

62.   This is an action against the Hometown Park Sale Defendants, MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants for their violation of the Florida Antitrust Act of 1980, §§ 542.18 and 542.19, *Fla. Stat.*

63.   Since at least October 2016, the MHC/ELS Park Purchase Defendants (or one or more of its subsidiaries) leased mobile home lots to the homeowners represented by the Plaintiff, in a continuous and uninterrupted flow of interstate trade or commerce, including through and into this judicial district within the meaning of the Florida Antitrust Act.

64.   The Hometown Park Sale Defendants, MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants knowingly—that is, voluntarily and intentionally—extorted under Florida law and attempted to entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or to impose a mobile home lot rental by subjecting the

mobile homeowners, their representative mobile homeowner associations ("HOAs"), and the Park lot rental agreements to, among other things, impose an illegal Long Term Agreement ("LTA"), thereby reducing or eliminating price competition.

65.     To be clear, Plaintiff is not alleging that the Hometown Park Sale Defendants and the MHC/ELS Park Purchase Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to fix the prices of mobile home lot rental amount at the same level. Instead, the Hometown Park Sale Defendants and the MHC/ELS Park Purchase Defendants, working with FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants, conspired to eliminate discounting of lot rental amount by ensuring that all park owners charged the same minimum price and used the same terms.[3] The MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm all share an interest in not reducing the lot rental amount.

66.     The scheme was anything but "unilateral." The conduct at issue here can be characterized as consciously parallel business conduct

---

3       As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing." (Emphasis added)

similar to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp.*: "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as 'unilateral' or merely 'parallel.'" 384 U.S. 127, 148 (1966)

67.     The FMHA Trade Association Defendant, as the Florida mobile home park owners' trade association represented by the Lutz Bobo Law Firm Defendants, worked with the MHC/ELS Park Purchase Defendants and the Lutz Bobo Law Firm Defendants to develop and implement LTAs and other matters alleged herein, *supra*, across Florida mobile home parks. That is, FMHA Trade Association Defendant, was in a position to communicate to Florida mobile home park owners before it implemented the scheme including, but not limited to, the LTA that its competitors also intended to do so and the suggested format of the LTA.

68.     The MHC/ELS Park Purchase Defendants and the Lutz Bobo

Law Firm Defendants' close relationships with FMHA Trade Association Defendant, enabled them to collaborate with other mobile home park owners and ultimately with each other to develop these conspiratorial plans, including the LTA. Since 2015 Allen Bobo, and the LBT PA worked closely with Eric Zimmerman, then Senior Vice President of ELS Inc., on revisions and implementation of LTAs, for example.

69. Each of the MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants had a motive to maintain high retail prices for mobile home lot rental amounts. In addition, in order to encourage independent mobile home park owners to adopt and implement LTAs, the MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants needed to keep the resale mobile home lot rental amounts high.

70. The MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants have also demonstrated a past propensity to conspire against other mobile home park owners discounting mobile home lot rental amounts.

71. The MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants'

agreement to implement LTAs has harmed and continues to harm competition by increasing prices for the mobile home lot rental amounts made subject to them. Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for mobile home lot rental amounts affected by LTAs. The effect of the LTAs has been to limit consumer choice by depriving them of the ability to shop around for discounts on mobile home lot rental amounts.

72.     The Hometown Park Sale Defendants, MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants (and their co-conspirators) furthered and effectuated their conspiracy in the following ways, among others:

a.     Participating in secret communications, discussions, and meetings in the U.S. to exchange confidential and competitively sensitive information regarding each other's lot rental amounts charged in their Florida mobile home business;

b.     From time to time, discussing and agreeing during those conversations and meetings to set a price floor to be quoted to a mobile homeowner;

c.     Perpetuating the Florida mobile home industry-wide

intentional frustration of the Plaintiff's and other

representative homeowners' associations' statutory right

of first refusal to purchase their Park;

d. Perpetuating the distribution of an illegal LTA which

supports their fixed rent increases and violates Chapter

723, *Fla. Stat.*, and the homeowners' right to a civil

jury trial in violation of the Florida and United States

Constitution;

d. Deceive and defraud resale purchasers into adoption of

a market-based prospectus;

e. Concealed Park-wide flooding from resale purchasers;

f. Imposed fraudulent and unreasonable lot rental

categories and amount; and

g. Unreasonably eliminate or reduce services.

73. As a direct and proximate result of the Hometown Park

Sale Defendants, MHC/ELS Park Purchase Defendants, FMHA Trade

Association Defendant, and the Lutz Bobo Law Firm Defendants' conduct,

the homeowners represented by the Plaintiff have been harmed and will

continue to be harmed by paying supra-competitive lot rental amounts

charged in Florida mobile home parks that they would not have paid in the

absence of the conspiracy.

74.     The Hometown Park Sale Defendants, MHC/ELS Park Purchase Defendants, FMHA Trade Association Defendant, and the Lutz Bobo Law Firm Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests the following relief:

1.     A jury verdict for compensatory damages;

2.     A judgment against all defendants, jointly and severally, by the Court for treble the amount of the jury verdict and for attorney's fees, costs and interest as allowable by law for violations of the Florida Antitrust Act;

3.     An order that each defendant be permanently enjoined from future violations of Chapter 542, *Fla. Stat.*

4.     An order that the plaintiff be awarded its costs of this suit and reasonable attorney's fees pursuant to § 542.22(1), *Fla. Stat.*;

5.     A judgment and decree that the defendants have engaged in an unlawful combination or a conspiracy restricting trade and commerce in violation of §§ 542.18 and 542.19, *Fla. Stat.*

6.     Award the Plaintiff such other and further equitable and legal

relief as the Court deems just and necessary.

## VI.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable by jury.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 25, 2021, I electronically filed

the foregoing with the Clerk of the Court using the CM/ECF system which

will send a notice of electronic filing to all counsel of record.

<u>s/ Daniel W. Perry</u>
Attorney